# United States Court of Appeals for the Federal Circuit

---

**METCALF CONSTRUCTION COMPANY, INC.,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2013-5041

---

Appeal from the United States Court of Federal Claims in No. 07-CV-0777, Judge Susan G. Braden.

---

Decided: February 11, 2014

---

ROBERT J. SYMON, Bradley Arant Boult Cummings LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief was ERIC A. FRECHTEL.

ELLEN M. LYNCH, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were STUART F. DELERY, Assistant Attorney General, JEANNE E. DAVIDSON, Director, REGINALD T. BLADES, JR., Assistant Director, and RUSSELL J. UPTON, Trial Attorney.

JERROLD J. GANZFRIED, Holland & Knight LLP, of Washington, DC, for amicus curiae Associated General Contractors of America. With him on the brief was STEPHEN B. SHAPIRO. Of counsel on the brief was RALPH C. NASH, of Washington, DC.

MAURICE BASKIN, Venable LLP, of Washington, DC, for amicus curiae Associated Builders and Contractors, Inc. With him on the brief was REBECCA PEARSON.

ROBYNNE T. PARKINSON, Thaxton Parkinson PLLC, of Mercer Island, Washington, for amici curiae The Design-Build Institute of America, et al. Of counsel on the brief was MICHAEL LOULAKIS, Capital Project Law Group PLLC, of Reston, Virginia.

_____

Before O'MALLEY, PLAGER, and TARANTO, *Circuit Judges.*

TARANTO, *Circuit Judge.*

We consider the scope of the duty of good faith and fair dealing under a contract between the federal government and a private company engaged to design and to build housing for the military. We hold that the Court of Federal Claims misread our precedent in articulating what the contractor, Metcalf Construction Company, needed to show in order to prove that the government breached that duty. We also hold that the trial court misinterpreted certain contractual provisions related to Metcalf's good-faith-and-fair-dealing claim. We therefore vacate the trial court's decision that Metcalf failed to establish liability, vacate the accompanying damages award, and remand for further proceedings using the correct standard.

BACKGROUND

A

In 2002, the United States Navy awarded Metcalf a contract to design and to build housing units at Marine Corps Base Hawaii, which is located on Kaneohe Bay on the northeastern side of the island of Oahu. Under the original contract, Metcalf had to build 188 units by March 2005, and the government promised to pay Metcalf $42,971,000. The parties modified the contract numerous times. Eventually, the contract required Metcalf to build 212 units by October 17, 2006, for a price of just under $50 million.

On December 31, 2002, the Navy told Metcalf to proceed with performance, but problems arose almost immediately. One involved the soil at the site of construction. "Expansive soil" swells when wet, which can lead to cracks in concrete foundations and other damage. Because the character of the soil could significantly affect the cost of construction, it was a topic of attention in the process preceding the signing of the contract. Before the Navy issued its initial request for proposals—the request to which Metcalf responded, leading to the contract—a government-commissioned report found that the soil at the site had a "slight expansion potential." In outlining construction requirements, the request for proposals cited that report as relevant to certain features of the project, such as concrete foundations.

The government made clear that its pre-request soil report was not to be the last word on soil conditions for purposes of the project. A revised request for proposals stated that the requirements in the "soil reconnaissance report" were "for preliminary information only." The resulting contract required that the contractor conduct its own independent soil investigation, and it incorporated Federal Acquisition Regulation (FAR) 52.236-2, 48 C.F.R. § 52.236-2, which concerns site conditions that differ

materially from those disclosed in the contract. Even before potential bidders had submitted proposals in response to the request, the government had clarified, in a publication written in question-and-answer form, that the contract would be amended if the contractor's post-award independent investigation turned up soil conditions significantly different from those described in the government's report:

> Q15: . . . This requires an independent investigation after award. . . . Should we infer from this that any unforeseen soil conditions or variances from the Government's soils report will be dealt with by change order?

> Answer: Yes, if there's a major disparity from the Government's soil reconnaissance report.

At the end of January 2003, after the contract took effect, Metcalf hired Geolabs, Inc., to investigate the soil. Five months later, Geolabs reported that the soil's swelling potential was "moderate to high," not "slight" (as the pre-bid government study had said), and recommended a course of action to account for the newly uncovered condition. Within days, Metcalf notified the Navy. Discussions ensued, delaying construction for roughly a year. In those discussions, Metcalf insisted on following Geolabs's recommendations, while the Navy generally insisted on following construction requirements set out in the original contract. By mid-2004, Metcalf decided that the cost of waiting for the Navy to approve the Geolabs-recommended design changes had become too high, and it began to implement those changes by over-excavating the soil and replacing it with non-expansive fill, despite awareness of the risk of proceeding without a contract modification.

In August 2004, the Navy came to rest on how it would treat Metcalf's claim regarding the soil's swelling potential. The Navy denied that there was any material

difference between the pre-bid and post-award soil assessments and thus concluded that no additional compensation was warranted. But the Navy also approved contract modifications that (1) paid Metcalf about $14,000 for additional soil tests and (2) authorized Metcalf to build two prototype units in accordance with Geolabs's recommendations, at an increased cost of $56,640 over an additional five days.

By that time, Metcalf was about 200 days "behind schedule." In an effort to get back on track, and in light of the Navy's decision, Metcalf decided to start addressing the expansive-soil issue through the use of "post-tension" concrete, which was more expensive than ordinary concrete but would avoid the additional time and cost of continuing to over-excavate the soil and import non-expansive fill. The trial court here noted that the Navy amended the contract to approve the use of post-tension concrete slabs (later concluding that Metcalf was not entitled to recover increased costs associated with that design change). All told, Metcalf claims that the expansive-soil problems cost more than $4.8 million, mostly for over-excavating the soil under certain units and using post-tension concrete slabs.

Delays in construction also resulted from the presence in the soil of more of a chemical contaminant—chlordane—than had been expected. In the request for proposals, the government had represented: "Chlordane is present in the soils around the building foundation. Remediation actions are not required since the levels are acceptable." The government made the same representation in its pre-proposal question-and-answer clarification:

> Q34: Does the Navy have any requirements for removal of the Chlordane contaminated soil, shown on the environmental survey? For example, if homes are built over the contaminated area

or will the Navy require removal of the Chlordane?

Answer: *No* remediation action of the Chlordane contaminated soil is required . . . .

In August 2003, after the contract took effect, the Navy issued instructions to Metcalf about testing the soil for chlordane and disposing of any contaminated soil.

By 2005, excavated soil was accumulating on the site, and Metcalf needed a place to store it. (The request for proposals had said that the contractor would have access to a landfill, but the landfill had closed.) Before moving the soil, Metcalf had to test it for chlordane. Metcalf found higher levels than the pre-bid representation by the government, and it notified the Navy. The parties discussed the matter, with each other and with State authorities. The Navy ultimately decided that, although the amount of chlordane found was higher than detected before the contract, the level that was acceptable was also higher than previously stated. With the exception of one "hot spot," the Navy deemed the site to be safe. The Navy afforded Metcalf a 286-day extension for completing the building project and reimbursed Metcalf $1,493,103 for costs associated with chlordane remediation, but Metcalf sought an additional $500,000.

There were other disputes and interruptions along the way to Metcalf's ultimate completion of the project. Metcalf alleges, for example, that the Navy imposed requirements not found in the written contract and that an uncooperative inspector hindered the project. The Navy accepted the last three buildings on March 2, 2007, a few months after the October 17, 2006 deadline (which was the result of certain extensions). Metcalf alleges that its final cost of construction was roughly $76 million. The government paid Metcalf less than $50 million.

B

On March 30, 2007, Metcalf filed a claim for damages with the Navy's contracting officer. What is relevant here is that Metcalf argued that the Navy had materially breached the contract and—what is before us—the implied duty of good faith and fair dealing under the contract. The contracting officer denied the claim.

Metcalf brought suit in the Court of Federal Claims under the Contract Disputes Act, 41 U.S.C. § 609 (2006) (later recodified at 41 U.S.C. § 7104, *see* Public Contracts Act of Jan. 4, 2011, Pub. L. No. 111-350, 124 Stat. 3677). The government counterclaimed under a liquidated-damages provision of the contract, seeking a specified amount for each day past October 17, 2006, that Metcalf had not completed the job. In early 2010, the case went to trial in two phases.

The court issued a decision on liability in December 2011. *Metcalf Const. Co. v. United States*, 102 Fed. Cl. 334 (2011). After analyzing each of Metcalf's particular complaints, the court concluded that Metcalf had "failed to establish liability under all claims alleged," *id.* at 370, with two exceptions. First, the court held that the Navy had violated FAR 52.236-2(b) by failing to investigate the expansiveness of the soil in a timely manner. *Id.* at 354, 370-71. Second, the court held that the Navy had not issued a proper notice to proceed at the beginning of the project until months later than contractually required. *Id.* at 369-70. The court ultimately determined that this delay was a breach that rendered Metcalf unable to work for that period, to its detriment. *Id.*; *Metcalf Constr. Co. v. United States*, 107 Fed. Cl. 786, 788 & n.2 (2012).

In its 2012 opinion on damages and the government's liquidated-damages counterclaim, the court decided that liquidated damages against Metcalf were proper because the parties had agreed to a completion date (October 17, 2006) and Metcalf missed it. The court rejected Metcalf's

argument that the two delay-causing breaches by the government nullified any liquidated damages based on late delivery. *Id.* at 789. As for the two government breaches, the court held first that Metcalf was not entitled to damages for the expansive-soil-related breach because only "post-January 2006 delays, primarily occasioned by the chlordane remediation, were responsible for Metcalf not completing the project on time"; the court had rejected liability for chlordane problems; and (an apparent implicit premise) the only damages sought were tied to delay of completion past the due date. *Id.* at 794-95. The court found, however, that Metcalf was entitled to $272,191.59 in damages on the notice-to-proceed breach ($2,700 per day in "general condition costs" for 99 days, plus a "1.83% general overhead rate"). *Id.* at 795 & n.15. On December 28, 2012, the court entered final judgment for the government in the amount of $2,401,315.41 ($2,637,507 in liquidated damages minus $272,191.59), plus interest.

Metcalf appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

Two claims are at issue: Metcalf's claim for breach of the implied duty of good faith and fair dealing, and the government's counterclaim for liquidated damages. *See* Oral Arg. at 15:20-20:45 ("Q [to Metcalf's counsel]: You have only one count of the complaint surviving, and that's based on the duty of good faith and fair dealing? A: That's correct."). Metcalf takes issue with the trial court's decisions on both. With respect to its own claim, Metcalf contends that the court (A) applied the wrong legal standard and (B) misinterpreted certain contract provisions underlying the claim. We agree, and we therefore vacate the judgment on Metcalf's claim and remand. Because the reconsideration of liability for government breach may affect any entitlement the government has to liquidated

damages, we vacate the judgment on the government's counterclaim and remand on that matter as well.

## A

### 1

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." Restatement (Second) of Contracts § 205 (1981) ("Restatement"), quoted in *Alabama v. North Carolina*, 120 S. Ct. 2295, 2312 (2010). Failure to fulfill that duty constitutes a breach of contract, as does failure to fulfill a duty "imposed by a promise stated in the agreement." Restatement § 235. We have long applied those principles to contracts with the federal government. *E.g.*, *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 828 (Fed. Cir. 2010); *Malone v. United States*, 849 F.2d 1441, 1445-46 (Fed. Cir. 1988).

Identifying some acts as breaches of the duty, like "[s]ubterfuges and evasions," *id.* at 1445, may require little reference to the particular contract. In general, though, "what that duty entails depends in part on what that contract promises (or disclaims)." *Precision Pine*, 596 F.3d at 830. That is evident from repeated formulations that capture the duty's focus on "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party" (Restatement § 205 cmt. a), which obviously depend on the contract's allocation of benefits and risks. "The covenant of good faith and fair dealing . . . imposes obligations on both contracting parties that include the duty not to interfere with the other party's *performance* and not to act so as to destroy the *reasonable expectations* of the other party regarding the *fruits of the contract*." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005) (emphases added). "Both the duty not to hinder and the duty to cooperate are aspects of the implied duty of good faith and fair dealing." *Precision Pine*, 596 F.3d at 820 n.1. What is promised or

disclaimed in a contract helps define what constitutes "lack of diligence and interference with or failure to cooperate in the other party's performance." *Malone*, 849 F.2d at 1445. In short, while the implied duty exists because it is rarely possible to anticipate in contract language every possible action or omission by a party that undermines the bargain, the nature of that bargain is central to keeping the duty focused on "honoring the reasonable expectations created by the autonomous expressions of the contracting parties." *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1152 (D.C. Cir. 1984) (per Scalia, J.).

We have expressed this principle when we have said that the "implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *E.g.*, *Precision Pine*, 596 F.3d at 831. Although in one sense any "implied" duty "expands" the "express" duties, our formulation means simply that an act will not be found to violate the duty (which is implicit in the contract) if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision. The implied duty of good faith and fair dealing is limited by the original bargain: it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value. *See First Nationwide Bank v. United States*, 431 F.3d 1342, 1350 (Fed. Cir. 2005) (duty was breached by legislation that "changed the balance of contract consideration").

We applied these principles in *Precision Pine*, which involved logging contracts that expressly allowed the government to suspend the private contractor's timber-harvesting operations in order to "'comply with a court order.'" 596 F.3d at 828. Faced with an injunction pro-

hibiting logging, the government suspended the contracts, as the contracts allowed, and we declined to find a breach of the duty of good faith and fair dealing in alleged unreasonable delay in the government's carrying out of actions ordered by the court before harvesting might resume. *Id.* at 828-31. We held that there was no breach because of two grounds combined: the challenged delays "were (1) not 'specifically targeted[' at the contracts,] and (2) did not reappropriate any 'benefit' guaranteed by the contracts, since the contracts contained no guarantee that . . . performance would proceed uninterrupted." *Id.* at 829.

On the central point about the underlying contract bargain, *Precision Pine* emphasized that "the contracts expressly qualified" the benefit of timber harvesting that Precision Pines alleged the government's actions had impaired. *Id.* More specifically, as we later explained, the particular "court order" clause of the contract at issue in *Precision Pine*, in expressly authorizing suspension of harvesting to comply with a court order, made clear that the contract bargain did not include limits on the timing of the government's compliance with an obligation imposed by the court. *Scott Timber Co. v. United States*, 692 F.3d 1365, 1375 (Fed. Cir. 2012) ("Significantly, here, as in *Precision Pine,* the obligation to comply with the injunction is not owed to the timber company but to the court that issued the injunction and the party that sought the injunction. There is no basis for redefining the concept of good faith and fair dealing to include a requirement of diligence in complying with obligations imposed by another tribunal in a separate case."). As a result, an essential basis of *Precision Pine* was that the challenged conduct was not contrary to the contract bargain. *Precision Pine*, 596 F.3d at 830 (stressing that the challenged

delay involved obligations under the injunction, not under the contract).[1]

Our recent decision in *Bell/Heery v. United States*, No. 2013-5002, –F.3d–, 2014 WL 43892 (Fed. Cir. Jan. 7, 2014), likewise reflects the need to take account of the particular contract at issue in considering a claim of breach of the good-faith-and-fair-dealing duty implicit in that contract. Bell/Heery's complaint "focuse[d] on the frustrating conduct of . . . an independent state agency," alleging in particular that the state agency had unreasonably administered state permits after Bell/Heery had based its bid for a federal-government project on a belief that the agency would act more favorably. *Id.* at *10. We concluded that the contract itself allocated to Bell/Heery the risks attending the securing of the required state permits, and we saw no basis for finding that the federal government had affirmatively interfered with Bell/Heery's dealings with the state agency or "reappropriated benefits promised to [Bell/Heery] under the contract." *Id.* at *9-10. On those bases, we rejected a good-faith-and-fair-dealing claim that sought to shift the responsibility for a state agency's alleged unreasonableness onto the federal government.

---

[1] In *Scott Timber*, the court underscored the centrality of understanding the allocation of benefits and risks by the specific contract provisions at issue when it contrasted the specific "court order" contract provision at issue there and in *Precision Pine* with the distinct contract provision under which the government had acted in an earlier case involving the Scott Timber Company. *See Scott Timber*, 692 F.3d at 1375 & n.4, describing *Scott Timber Co. v. United States*, 333 F.3d 1358 (Fed. Cir. 2003).

2

The trial court's decision in this case rests on an unduly narrow view of the duty of good faith and fair dealing.  Relying almost entirely on *Precision Pine*, it held that "a breach of the duty of good faith and fair dealing claim against the Government can *only* be established by a showing that it 'specifically designed to reappropriate the benefits [that] the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract.'" *Metcalf*, 102 Fed. Cl. at 346 (emphasis added; bracketed word added by trial court).  Underscoring its narrow view, the court added that "incompetence and/or the failure to cooperate or accommodate a contractor's request do not trigger the duty of good faith and fair dealing, unless the Government 'specifically targeted' action to obtain the 'benefit of the contract' or where Government actions were 'undertaken for the purpose of delaying or hampering performance of the contract.'" *Id.* (alterations omitted).  The court invoked those principles when deciding Metcalf's specific claims for breach. *E.g.*, *id.* at 363-64.

The trial court misread *Precision Pine*, which does not impose a specific-targeting requirement applicable across the board or in this case.  The cited portion of *Precision Pine* does not purport to define the scope of good-faith-and-fair-dealing claims for all cases, let alone alter earlier standards.  The passage cited by the trial court, after saying as a descriptive matter that cases of breach "typically involve some variation on the old bait-and-switch," *Precision Pine*, 596 F.3d at 829, says that the government "*may* be liable"—not that it is liable *only*—when a subsequent government action is "specifically designed to reappropriate the benefits the other party expected to obtain from the transaction." *Id.* (emphasis added). *Precision Pine* then states its holding as rejecting breach for two reasons combined: the challenged government actions "were (1) not 'specifically targeted[' at the con-

tracts,] and (2) did not reappropriate any 'benefit' guaranteed by the contracts." *Id.*

As that statement indicates, the court in *Precision Pine* did not hold that the absence of specific targeting, by itself, would defeat a claim of breach of the implied duty—*i.e.*, that proof of specific targeting was a requirement for a showing of breach. When the court said that specific targeting would have been required for breach of the duty *in that case*, *id.* at 830, it did so in a context in which the more general bargain-impairment grounds for breach of the duty were unavailable, because the suspension-by-court-order provision expressly authorized the suspension, without limitation on the time of compliance with the order. That is enough to make clear that specific targeting is not a general requirement. In addition, the challenged government conduct in *Precision Pine* occurred in implementing a separate government authority and duty independent of the contract, namely, enforcement of and compliance with the injunction. In that context—as in the legislative context from which *Precision Pine* borrowed its reference to specific targeting, 596 F.3d at 830 (citing *Centex* and *First Nationwide Bank*)—the "specifically targeted" language protects against use of the implied contract duty to trench on the authority of other government entities or on responsibilities imposed on the contracting agency independent of contracts. The present case involves no such concern.

The government attempts to defend the trial court's standard by arguing that *Precision Pine* did not change the good-faith-and-fair-dealing standard. But that assertion sidesteps the question of what standards *Precision Pine* and other precedents establish. The answer to that question is that, as already explained, neither *Precision Pine* nor other authority supports the trial court's holding that specific targeting is required generally or in the present context, which does not involve the kind of dual-authority circumstances that gave rise to the "specifically

targeted" formulation as part of the inquiry in *Precision Pine*. The general standards for the duty apply here. The trial court erred in relying on *Precision Pine* for a different, narrow standard.

In seeking nevertheless to defend the trial court's judgment, the government relies on a legal standard it draws from another statement in *Precision Pine*—that the duty "cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Id.* at 831. That statement does not even on its face support the specific-targeting standard applied by the trial court. It is also not a statement the trial court recited and relied on. Critically, moreover, as a substantive matter, the quoted language does not mean what the government seems to urge.

As we have already explained, all that the quoted language means is that the implied duty of good faith and fair dealing depends on the parties' bargain in the particular contract at issue. *See* section A.1, *supra*. The government suggests a much more constraining view when it argues, for example, that there was no breach of the implied duty because "Metcalf cannot identify a contract provision that the Navy's inspection process violated." Gov't Br. 16. That goes too far: a breach of the *implied* duty of good faith and fair dealing does not require a violation of an *express* provision in the contract.

The government cites a few decisions to bolster its apparent position, but none of them holds that the implied duty requires a breach of an express contractual duty. For example, *Bradley v. Chiron Corp.*, 136 F.3d 1317 (Fed. Cir. 1998), in addressing a claim of constructive fraud under California law, mentions the duty of good faith and fair dealing only in a parenthetical explaining an intermediate appellate court decision from California, *id.* at 1326, and the cited decision itself makes clear that

"the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." *Racine & Laramie, Ltd. v. California Dep't of Parks and Recreation,* 11 Cal. App. 4th 1026, 1031-32, 14 Cal. Rptr. 2d 335, 339 (1992) (internal quotation marks omitted). In *Centex,* moreover, we declined to read *Bradley*'s parenthetical expansively, concluding that "it would be inconsistent with the recognition of an implied covenant if we were to hold that the implied covenant of good faith and fair dealing could not be enforced in the absence of an express promise to pay damages in the event of conduct that would be contrary to the duty of good faith and fair dealing." 395 F.3d at 1306. And the government's other featured case, *United States v. Basin Elec. Power Co-op.,* 248 F.3d 781 (8th Cir. 2001), similarly recognizes that the implied duty in fact is not limited to "the enforcement of terms actually negotiated." *Id.* at 796 (internal quotation marks omitted).

For these reasons, the trial court's standard for judging the claim of breach of the implied duty of good faith and fair dealing was improperly narrow. So too is the standard the government now seems to advance as its principal defense of the trial court's decision. Whether the government breached the duty of good faith and fair dealing—as to the expanded-soil problem, the chlordane problem, or any other properly preserved matter— requires reconsideration under the familiar broader standards reflected in the passages from *Centex* and *Malone* quoted above. Accordingly, we must vacate the judgment on Metcalf's claim and remand.

## B

Two matters warrant further elaboration. Under the correct standard, although Metcalf is pursuing only a

good-faith-and-fair-dealing claim, any breach of that duty has to be connected, though it is not limited, to the bargain struck in the contract. *See* section A.1, *supra.* Proper application of the implied-duty standard thus depends on a correct understanding of the contract. Metcalf contends that the trial court misinterpreted several contract provisions related to its claim. We agree.

The first set of provisions pertains to site conditions—in particular, expansive soils and chlordane. The contract incorporates FAR 52.236-2, which is entitled "Differing Site Conditions" and provides:

> (a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

> (b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

48 C.F.R. § 52.236-2. The RFP and pre-bid documents set out an understanding of how that provision would be applied to soil conditions. For both swelling potential and chlordane, the RFP incorporated representations about the site: it invoked a report on expansive soils for "site preparation, foundation support, footing, slab and rein-

forcement requirements," and it said that "[r]emediation actions are not required since [chlordane] levels are acceptable." On both issues, the contract also anticipated that Metcalf would test and investigate the soil in the process of performance. But a pre-bid question-and-answer stated in plain terms that material deviations from the government's report on swelling potential would be "dealt with by change order" and that "[n]o remediation action of the Chlordane contaminated soil is required."

The trial court interpreted the pre-bid site representations and related RFP provisions to be nullified by Metcalf's investigative responsibilities during performance. With respect to expansive soils, the court held that a reasonable contractor reading the contract documents as a whole would not interpret them as making a representation as to the site conditions because "the Contract required Metcalf to conduct an independent soil analysis [and so] Metcalf was on notice that it could not rely on the 'information only' report." *Metcalf*, 102 Fed. Cl. at 354. Metcalf was entitled to rely on the report "for bidding purposes," the court said, but not "in performing the . . . project." *Id.* Analogously, with respect to chlordane, the court held that the fact that Metcalf would itself need to assess the soil meant that Metcalf could not rely on the representations that remediation was not required; the company "was on notice to seek more information." *Id.* at 358-59. The court thus treated the contract as placing on Metcalf the risk and costs of dealing with newly discovered conditions different from those stated by the government before the contract became binding.

These rulings about an important allocation of risk were based on a misinterpretation of the contract. Nothing in the contract's general requirements that Metcalf check the site as part of designing and building the housing units, after the contract was entered into, expressly or implicitly warned Metcalf that it could not rely on, and

that instead it bore the risk of error in, the government's affirmative representations about the soil conditions.  To the contrary, the government made those representations in the RFP and in pre-bid questions-and-answers for bidders' use in estimating costs and therefore in submitting bids that, if accepted, would create a binding contract.  The natural meaning of the representations was that, while Metcalf would investigate conditions once the work began, it did not bear the risk of significant errors in the pre-contract assertions by the government about the subsurface site conditions.

FAR 52.236-2, incorporated into the contract, reinforces that meaning.  It exists precisely in order to "take at least some of the gamble on subsurface conditions out of bidding": instead of requiring high prices that must insure against the risks inherent in unavoidably limited pre-bid knowledge, the provision allows the parties to deal with actual subsurface conditions once, when work begins, "more accurate" information about them can reasonably be uncovered. *Foster Const. C. A. & Williams Bros. Co. v. United States*, 435 F.2d 873, 887 (Ct. Cl. 1970); *see also H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1343 (Fed. Cir. 1998).  For that reason, even requirements for *pre*-bid inspection by the contractor have been interpreted cautiously regarding conditions that are hard to identify accurately before work begins, so that "the duty to make an inspection of the site does not negate the changed conditions clause by putting the contractor at peril to discover hidden subsurface conditions or those beyond the limits of an inspection appropriate to the time available." *Foster*, 435 F.2d at 888; *see also, e.g.*, *Hollerbach v. United States*, 233 U.S. 165, 170-71 (1914).

The conclusion is not changed by the statement in a revised RFP that the expansive-soil report was "for preliminary information only."  J.A. 20141.  That statement merely signals that the information might change (it is "preliminary").  It does not say that Metcalf bears the risk

if the "preliminary" information turns out to be inaccurate. We do not think that the language can fairly be taken to shift that risk to Metcalf, especially when read together with the other government pronouncements, much less when read against the longstanding background presumption against finding broad disclaimers "of liability for changed conditions." *United Contractors v. United States*, 368 F.2d 585, 598 (Ct. Cl. 1966).

Apart from the soil-condition issues, Metcalf also challenges the trial court's holding that the contract required written approval for all design changes, including those changes that would leave the resulting design still within the performance requirements of the RFP. *Metcalf*, 102 Fed. Cl. at 359-60. We see no basis for such an interpretation in the two provisions cited by the trial court and the government. The first states:

1D.6 PRECEDENCE: In the event of conflict or inconsistency between any of the provisions of the various portions of this contract, for which the reconciliation of which is not otherwise provided in the RFP, precedence shall be given in the following order with the provisions of any particular portion prevailing over those of a subsequently listed portion:

(a) Typewritten portions of the contract.

(b) The provisions of the "Request of Proposals" issued in connection with this contract (including all addenda, amendments, or other modifications issued thereunder).

(c) Printed provisions of the contract form including printed provisions of added slip sheets.

(d) The contents of the contractor's proposal, including but not limited to his forwarding letter, drawings, outline specifications, accepted alternates or additives, and materials, tests or

> other data (including all supplements, amendments and modifications thereto).
>
> (e) The Government reviewed contractor prepared final plans and specifications, except to the extent that any variation therein has been specifically approved in writing by the Government.

J.A. 20039. That provision simply defines a hierarchy for determining what terms prevail over other terms when there is an inconsistency, placing certain government-reviewed specifications lowest in the hierarchy, with an exception for approved variations. Whatever the provision precisely means, it does not say that Metcalf needed written approval for all design changes.

The second provision relied on by the government states:

> 4. VARIATIONS: Variations from contract requirements require Government approval pursuant to Contract Clause entitled "Specifications and Drawings for Construction" and will be considered where advantageous to the Government.

J.A. 20231. That provision requires government approval only for variations from "contract requirements." As to what "contract requirements" means, Metcalf points to early communications between the parties suggesting that the phrase did not sweep in all elements of a design, and specifically did not include elements not required by the government-provided specification in the RFP that became part of the contract. *See* Metcalf Br. 45-47; *Dynamics Corp. of Am. v. United States*, 389 F.2d 424, 430 (Ct. Cl. 1968) ("[T]he action of the parties 'before a controversy arises is highly relevant in determining what the parties intended.'"). This issue warrants further exploration on remand. At present, we decline to interpret the reference to "contract requirements" to necessitate written approval for all design changes, regardless of their

size or whether the resulting design remains within the scope of the RFP.

## C

Having decided to vacate the trial court's judgment on liability and remand for further proceedings, we do the same for the damages award. The amount of damages could change after reevaluation of Metcalf's claim, both for the good-faith-and-fair-dealing claim and for the government's liquidated-damages counterclaim. The affirmative claim and the counterclaim, both involving the effect of government-caused delays on the completion date, appear to be intertwined. Accordingly, damages should be revisited alongside liability on remand.

### CONCLUSION

We vacate the claim court's decision and remand for further proceedings.

Costs to Metcalf.

**VACATED AND REMANDED**