# United States Court of Appeals for the Federal Circuit

_____

**G4S TECHNOLOGY LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

_____

2014-5078

_____

Appeal from the United States Court of Federal Claims in No. 1:12-cv-00008, Judge Nancy B. Firestone.

_____

Decided: March 6, 2015

_____

LEWIS STEVEN WIENER, Sutherland Asbill & Brennan LLP, Washington, DC, argued for plaintiff-appellant. Also represented by GERIN BRENDAN BALLARD.

DAVID ALAN LEVITT, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by STUART F. DELERY, ROBERT E. KIRSCHMAN, JR., SCOTT D. AUSTIN.

_____

Before PROST, *Chief Judge,* NEWMAN and TARANTO,
*Circuit Judges.*

Opinion for the court filed by *Chief Judge* PROST.

Dissenting opinion filed by *Circuit Judge* NEWMAN.

PROST, *Chief Judge.*

G4S Technology LLC ("G4S") appeals from the United
States Court of Federal Claims' grant of summary judg-
ment for the government.  The Court of Federal Claims
held that G4S is not a third party beneficiary of the
government's contract with Open Range Communications,
Inc. ("Open Range"), and thus that the government is not
liable on G4S's contract claims.  We affirm.

BACKGROUND

This case arises out of a $267 million loan from the
Department of Agriculture's Rural Utilities Service
("RUS") and Open Range to finance construction of wire-
less broadband networks in 540 RUS-approved markets.
As part of the project, Open Range also planned to bring
wireless broadband service to a number of other markets
outside the scope of the RUS loan.  To finance this aspect
of the construction, Open Range secured $97 million of
venture capital financing from One Equity Partners III,
L.P. ("OEP").   These agreements were announced in
January 2009.

As part of the loan agreement with RUS, Open Range
was required to keep a pledged deposit account, in which
RUS would advance loan funds as needed over the course
of the project.  To receive loan funds, Open Range was
required to submit a financial requirement statement
("FRS") outlining the purpose of the advance and includ-
ing relevant invoices and purchase orders.  While Open
Range had some limited flexibility to shift funding from
one purpose to another, Open Range was expected to use

the advanced funds for the purpose stated in the corresponding FRS.

RUS anticipated that Open Range would execute the project through use of subcontractors. Accordingly, RUS and Open Range agreed that Open Range's relationships with subcontractors would be formalized through master service agreements ("MSAs"). Each MSA included technical specifications, pricing information, target completion dates, and other requirements. RUS edited and formally approved a generic MSA for Open Range to use in contracting with subcontractors. Open Range entered into one such MSA with G4S, which at the time was called Adesta.

Unfortunately, the project encountered difficulties just eighteen months after the loan agreement was signed. In July 2010, the Federal Communications Commission ("FCC") suspended a spectrum permit belonging to Globalstar, Inc. Because Open Range licensed its spectrum rights from Globalstar, Open Range lost the spectrum rights necessary to operate the planned broadband network. Under the loan agreement, loss of spectrum rights gave RUS the right to terminate the loan. Consequently, on July 14, 2010, RUS gave Open Range notice of its intent to terminate all remaining funds on the loan unless Open Range could obtain replacement spectrum rights.

Open Range relied on the RUS loan money to pay its subcontractors, including G4S, so the July 14, 2010 RUS notice to Open Range worried Open Range's subcontractors. Soon after the notice, subcontractors' fears were realized as Open Range began failing to meet its payment obligations. By mid-September, Open Range had notified RUS by email that Open Range was behind in compensating its subcontractors.

Nonetheless, Open Range kept working to secure replacement spectrum rights. On September 22, 2010, the

FCC issued a temporary permit to Open Range giving Open Range spectrum access covering 264 of the originally planned 540 communities until January 31, 2011. The next day, Open Range emailed RUS to inquire about RUS advancing funds, given that some subcontractors were threatening to leave the project. Lindsay Daschle, a Senior Advisor to the Secretary of Agriculture, responded by making loan money available and offering to reassure subcontractors that the project was moving forward. Daschle also submitted a letter to Open Range to serve as RUS's press release.

Despite RUS's efforts to bolster Open Range's credibility, subcontractors remained concerned about the project's ongoing viability. On October 4, 2010, a lobbyist for Open Range requested that RUS confirm in writing that RUS would continue to fund the project. RUS responded with two more public letters explaining that RUS would continue funding the project, but that the plan would be downsized in light of Open Range's failure to secure spectrum rights for the full scope of the original project.

With Open Range still struggling to meet payment deadlines to subcontractors, Open Range and RUS exchanged emails on January 11 and 12, 2011 about funding a G4S subcontract that had been orally approved by RUS at the end of 2010. A meeting was quickly set up between Open Range and RUS to discuss the issue. Still, a weekly status report sent by Open Range to RUS on March 11, 2011 revealed that Open Range maintained outstanding debts to G4S.

As it became clear that Open Range would be unable to regain the full spectrum rights necessary to complete the originally-contemplated project, RUS and Open Range executed a loan amendment on April 29, 2011 to reflect the project's decreased scope. The loan amount was reduced to $180 million, and the project was downsized to cover 160 RUS-approved markets. RUS also required

Open Range to secure $40 million of additional capital from OEP. In turn, in the equity commitment letter to Open Range, OEP conditioned its obligation to make its capital payment to Open Range upon prior satisfaction of two preconditions—that Open Range and RUS had modified their loan agreement and that RUS had advanced funds to Open Range for subcontractor work listed in two attached schedules, referred to as Schedules B-1 and B-2. Outstanding arrears to G4S were among those listed in Schedules B-1 and B-2.

After the equity commitment letter was signed, RUS and Open Range made the loan amendment and RUS advanced funds to Open Range to cover the amounts in Schedules B-1 and B-2, including $2.7 million that Open Range then paid to G4S. Still, Open Range was unable to pay G4S the full amount it owed.

Despite the loan amendment and new equity commitment letter, Open Range remained unable to satisfy its debts. Consequently, Open Range filed for bankruptcy on October 6, 2011.

While the bankruptcy proceedings were ongoing, G4S filed the instant suit in the Court of Federal Claims on January 3, 2012. The government moved to dismiss, arguing that the Court of Federal Claims lacked jurisdiction because G4S was not in contractual privity with the government. The Court of Federal Claims ruled that it would have jurisdiction if it found G4S to be a third party beneficiary of the RUS-Open Range contract, so the Court of Federal Claims ordered discovery limited to that issue. After discovery was completed, the government renewed its motion to dismiss. The Court of Federal Claims denied that motion, ruling that G4S had raised a non-frivolous claim. However, the Court of Federal Claims also converted the government's motion into a motion for summary judgment and held that G4S is not a third party beneficiary under the RUS-Open Range contract.

G4S appealed, and we have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3).

### DISCUSSION

Summary judgment is appropriate when the record, examined in the light most favorable to the non-movant, demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  R. Ct. Fed. Cl. 56(c); *see also* Fed. R. Civ. P. 56(c) (same).  We review the Court of Federal Claims' decision granting summary judgment de novo, drawing all justifiable factual inferences in favor of G4S.  *Ammex, Inc. v. United States*, 384 F.3d 1368, 1371 (Fed. Cir. 2004).  Whether G4S is a third party beneficiary under the RUS-Open Range contract is a mixed question of law and fact.  *Glass v. United States*, 258 F.3d 1349, 1353 (Fed. Cir. 2001).

"A nonparty becomes legally entitled to a benefit promised in a contract . . . only if the contracting parties so intend."  *Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 131 S. Ct. 1342, 1347 (2011); *see also US Ecology, Inc. v. United States*, 245 F.3d 1352, 1356 (Fed. Cir. 2001) (analyzing whether the government "intended for the alleged contract to 'confer a right' on any third party") quoting *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997)).  This intent may be either "express or implied," and it must be "fairly attributable to the contracting officer."  *Glass*, 258 F.3d at 1354; *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1263 (Fed. Cir. 2005).  In addition, the benefit to the third party must be "direct."  *Glass*, 258 F.3d at 1354; *see also* Restatement (Second) of Contracts § 302, Illustration 3 (distinguishing between intended and incidental beneficiaries based on whether a payment is made directly to the third party).  "[T]he Supreme Court has recognized the exceptional privilege that third-party beneficiary status imparts," and we have accordingly cautioned that the privilege of third party beneficiary

status "should not be granted liberally." *Flexfab*, 424 F.3d at 1259 (citing *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912)).

The parties agree that the contract contains no express declaration of intent. "In the absence of clear guidance from the contract language, the requisite intent on the part of the government can be inferred from the actions of the contracting officer and circumstances providing the contracting officer with appropriate notice that the contract provision at issue was intended to benefit the third party." *Id.* at 1262–63. G4S thus relies on circumstantial evidence to establish that the government intended to bind itself to Open Range's subcontractors.

Circumstantial evidence of governmental intent to bind itself to a third party must be considered in the context of the government's responsibilities to safeguard taxpayer funds and advance the public interest. In part to ensure that projects are executed consistent with these responsibilities, extensive regulatory schemes often govern government contracts. Given that third party beneficiary status is an "exceptional privilege," rarely will standard compliance with these regulatory schemes impart liability to a third party. *German Alliance,* 226 U.S. at 230; *see Astra*, 131 S. Ct. at 1348 n.4 ("We can infer no such [third party beneficiary] authorization where a contract simply incorporates statutorily required terms and otherwise fails to demonstrate any intent to allow beneficiaries to enforce those terms."). This proposition holds when the government exercises substantial oversight over the project. *See US Ecology*, 245 F.3d at 1356–57 (finding that, despite the government's intentions to substantially oversee a subcontractor's work, the subcontractor was not a third party beneficiary to the government-prime contractor contract). Indeed, the government's duty to the public often compels such oversight. Therefore, while circumstantial evidence may

establish that the government intended to bind itself to a third party, *see, e.g.*, *D&H Distrib. Co. v. United States*, 102 F.3d 542, 546–48 (Fed. Cir. 1996), the government's conduct should be evaluated in the context of its responsibility to protect the public interest.

Turning to the facts of this case, G4S cites several pieces of evidence which it argues indicate the government's intent to guarantee that subcontractors were paid. First, G4S places heavy reliance on the government's use of a pledged deposit account ("PDA") to advance funds to Open Range so that subcontractors like G4S could be paid. The loan agreement between Open Range and RUS required Open Range to maintain a PDA as a condition for obtaining draws on loan funds. To receive funds, Open Range had to request an advance in a Financial Requirements Statement indicating the purpose of the advance. Open Range also had to submit supporting materials such as invoices or purchase orders. Because RUS often advanced funds to the PDA for specific, approved work by subcontractors, G4S argues that the government intended that subcontractors benefit from the loan agreement.

There are several flaws in G4S's position. First, the PDA was a general fund used by RUS and Open Range to pay the costs of the project. Rather than to serve as a mechanism to guarantee that subcontractors were paid, the purpose of the PDA was to assist the government in reviewing and approving the costs of the project, whether or not they were related to subcontractor work. While RUS often advanced funds to Open Range that were tied to specific subcontractor work, this alone does not demonstrate that the government intended to make itself liable to subcontractors.

Second, longstanding precedent requires that the benefit to a third party beneficiary be "direct," and here the benefit to subcontractors from the loan agreement was not. *See German Alliance*, 226 U.S. at 230 ("Before a

stranger can avail himself of the exceptional privilege of suing for a breach of an agreement to which he is not a party, he must, at least, show that it was intended for his direct benefit."); *Glass*, 258 F.3d at 1354 ("In order to prove third party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly."). Here, all payments from RUS were distributed to G4S indirectly. RUS always paid Open Range, which then paid G4S pursuant to the Open Range-G4S contract.

In cases where we have found a subcontractor to be a third party beneficiary based on a payment mechanism, the subcontractor was always paid by the government more directly than in the circumstances of this case. For example, in *D&H Distributing Co. v. United States*, the government made the prime contractor and subcontractor joint payees under the government-prime contractor contract. 102 F.3d at 546–48. And in *J.G.B. Enterprises, Inc. v. United States*, the government payments to the prime contractor were held in escrow for the third party subcontractor. 497 F.3d 1259, 1260, 1261 n.1 (Fed. Cir. 2007). These payment arrangements are not the only payment mechanisms that can make a subcontractor a third party beneficiary, but our cases require more than a payment to a contractor's general fund, even if the government knows that subcontractors will be due certain portions of the fund.

Third, a PDA is a standard aspect of every RUS Broadband Initiatives Program contract. *See* Rural Utilities Service Broadband Initiatives Program Contracting, Work Order and Advance Procedures Guide, 9, *available                                            at* http://www.rurdev.usda.gov/supportdocuments/BIP_Contracting_and_Advance_Procedures_Guide_3-4-10.pdf. The government's procedures for approving Open Range's expenditures and advancing funds certainly fall within

the government's responsibilities to safeguard taxpayer funds and advance the public interest. As the PDA was a standard RUS contractual provision designed to effect these governmental responsibilities—and not to guarantee that G4S was paid—the PDA does not weigh in favor of finding that the government intended to make itself liable to G4S. *Astra*, 131 S. Ct. at 1348 n.4.

A similar analysis applies to the evidence regarding the MSA and Schedules B-1 and B-2. Both are common documents. As to the MSA, Open Range submitted a generic MSA for RUS comment and approval. RUS approved a MSA template for Open Range to use with its subcontractors. When contracting with G4S, Open Range used a materially identical version of the generic MSA, but RUS apparently never reviewed the Open Range-G4S MSA. The MSA template included various technical specifications and work requirements. The government thus used MSAs to exercise oversight over Open Range and its subcontractors. However, that oversight is entirely consistent with the government's general duty to protect the public interest. If anything, the fact that RUS did not individually approve Open Range's MSAs with each subcontractor indicates that RUS kept some distance between itself and the subcontractors. Rather than establish that RUS communicated any intent that it be bound to G4S, the MSA merely set baseline requirements for what constitutes acceptable work.

Schedules B-1 and B-2, which were attached to the loan amendment, outline the revised amounts for subcontractor work to be advanced to Open Range. G4S characterizes the schedules as proof of direct payments from RUS to G4S. However, Schedules B-1 and B-2 are little different from the financial requirements statements Open Range was required to periodically submit to RUS over the course of the contract. Significantly, Schedules B-1 and B-2 demonstrate only that RUS was aware that subcontractors like G4S were contracted by Open Range

to work on the project and that the subcontractors would likely be paid out of funds RUS advanced to Open Range. This evidence is hardly sufficient to prove that the benefit to G4S was direct and that the government intended to bind itself to G4S. Schedules B-1 and B-2 are just further examples of standard documents showing that the government exercised typical project oversight to be expected of a governmental body entrusted with taxpayer funds.

G4S also directs the court to several statements by RUS expressing concern about subcontractors not being paid by Open Range. For example, after learning that vendors were becoming seriously concerned that Open Range would not meet its payment obligations, RUS issued a September 23, 2010 letter in which it authorized "immediate release of the present in-house advance request for $14 million and the additional request for $5 million . . . ." Further, Lindsay Daschle, a Senior Advisor to the Secretary of Agriculture mentioned earlier, told Open Range that her "team feels the letter will serve as the press release and we will continue to talk to anyone (vendors, press, etc.) who we need to help calm fears and rebuild credibility."

Although G4S characterizes these statements as showing that RUS wanted to guarantee that subcontractors were paid, G4S overreads the statements. In fact, RUS's public letter and Daschle's email to Open Range express concern about Open Range's credibility with subcontractors after Open Range had failed to timely pay them for their work. Consequently, Daschle proposed the solution of talking to subcontractors like G4S for the purpose of rebuilding Open Range's credibility with subcontractors. G4S provides no evidence that it ever communicated directly with RUS. The communications between RUS and Open Range thus reinforce the conclusion that Open Range, not RUS, was the party entering into obligations with subcontractors such as G4S. Because Open Range had the ultimate authority over sub-

contractors, RUS—which was primarily responsible for ensuring the project was eventually completed—prioritized supporting Open Range so that Open Range could maintain a good relationship with its subcontractors. Therefore, the government did not express any intent that it be held liable for payments to subcontractors.

G4S's remaining evidence supports the conclusion that G4S is not a third party beneficiary of the RUS-Open Range contract. Eleven days after the September 23, 2010 letter, Open Range sent an email to RUS in which it indicated that it was facing severe financial trouble and that several subcontractors, including G4S, were especially concerned. RUS Assistant Administrator David Villano responded the next day on October 5, 2010, stating that he was willing to have a conference call with subcontractors. After Open Range replied that a conference call would be insufficient, RUS issued two additional public letters to Open Range. These letters give certain financial details, state that the project is going forward, and assure Open Range that RUS will continue to pay Open Range as work is done.

These further communications are subject to the same analysis as the September 23, 2010 letter and following emails. Even though RUS exhibits substantial concern for Open Range's financial obligations to subcontractors, this concern is always directed toward Open Range and the project's viability. RUS recognized that the project would not go forward if subcontractors ceased performance, so RUS committed to affirming Open Range's credibility and solvency. Significantly, however, RUS always left Open Range to use its new credibility in separate dealings with its subcontractors.

To summarize, RUS could have provided guarantees directly to G4S. RUS could have arranged to pay G4S itself. However, it did neither. Unlike in *D&H* and

*J.G.B.*, the government made no special payment arrangements. In fact, RUS did not even directly communicate with G4S. While RUS offered to speak to subcontractors, the purpose of those conversations was always to rebuild Open Range's credibility and subcontractors' confidence in the project. These actions evince only that RUS intended that the project move forward and that its investment of public funds not be wasted. Therefore, the September and October 2010 communications do not raise a genuine issue of material fact as to the government's intent to bind itself to G4S.

In conclusion, the government's actions never deviated from the scope of its sovereign responsibilities to safeguard taxpayer funds and advance the public interest. G4S asks that the government incur liability because it talked to the individuals in charge of a failing project in an attempt to fix the problems. If anything, this sort of governmental response should be encouraged. If G4S were to prevail here, almost any subcontractor over which the government exerts meaningful oversight and whose work is funded indirectly by the government would be a third party beneficiary of the government's contract with the prime contractor. That cannot be so. As such, the evidence, viewed in the light most favorable to G4S, is insufficient to establish that RUS and Open Range intended that G4S be legally entitled to directly benefit from the contract. Therefore, the Court of Federal Claims properly granted the government's motion for summary judgment and held that G4S is not a third party beneficiary to the RUS-Open Range contract.

CONCLUSION

Accordingly, we affirm the Court of Federal Claims' grant of the government's motion for summary judgment. G4S is not a third party beneficiary of RUS's contract with Open Range.

**AFFIRMED**

# United States Court of Appeals
# for the Federal Circuit

---

**G4S TECHNOLOGY LLC,**
*Plaintiff-Appellant*

v.

**UNITED STATES,**
*Defendant-Appellee*

---

2014-5078

---

Appeal from the United States Court of Federal Claims in No. 1:12-cv-00008-NBF, Judge Nancy B. Firestone.

---

NEWMAN, *Circuit Judge*, dissenting.

I respectfully dissent. The panel majority, in sustaining summary judgment in favor of the government, holds that the Rural Utilities Service of the Department of Agriculture (the "government" or "RUS") cannot be liable for payment to the sub-contractor for work performed in response to the government's requests to continue with the project, amid government reassurances and actions "to rebuild Open Range's credibility and subcontractors' confidence in the project." The government provided such reassurance repeatedly, for "RUS intended that the project move forward;" whereupon the subcontractor continued to perform based on these government representations. Maj. Op. at 13.

The government ambitiously planned the construction of an electronic and digital information and communications system to provide broadband service to the vast rural areas of the nation. The project was implemented by "master service agreements" between Open Range and each subcontractor; each master service agreement was reviewed, adjusted, and approved by RUS. Each contract phase required prior authorization and approval by RUS. The work for which G4S here seeks payment had been authorized and approved by RUS.

When G4S and other subcontractors declared their intention to cease work because Open Range was not paying them the approved amounts for work already done, RUS provided reassurance to the subcontractors, issued press releases, deposited additional funds with Open Range, and urged that performance continue. My colleagues state that they "encourage" such governmental intervention. *See id*. at 13 ("G4S asks that the government incur liability because it talked to the individuals in charge of a failing project in an attempt to fix the problems. If anything, this sort of governmental response should be encouraged."). But even as the court recognizes that the government persuaded the subcontractors to continue performance, the court also holds that the government can avoid payment for the performance it solicited and obtained.

The government moved in the Court of Federal Claims for summary judgment of no liability, and that court granted the motion on the ground that the subcontractors are not "third party beneficiaries" of the prime contract. No other theory was discussed in the court's decision. The panel majority affirms on the ground that G4S, as a subcontractor, is not a third party beneficiary of the contract between RUS and Open Range. However, third-party-beneficiary theory is not as rigid as my colleagues state, and depends on the actual relationship among those concerned.

The claim before us is for payment for the work G4S did, after receiving the government's and Open Range's reassurances of payment. G4S seeks this payment for work done at the urging of the government, work that had previously been authorized by the government in accordance with the subcontract terms approved and in large part drafted by the government.

The complex of these arrangements is not that of simple prime- and sub-contractor obligations. The summary judgment record is not fully developed, but the facts at this stage plausibly support an obligation on the government, in law and/or in equity, to pay for that which it requested and urged. Such an obligation may arise on the facts of particular relationships, not on the generalities of third party beneficiary law. I would remand for determination of the obligations incurred on the specific facts of this case.

The United States, like other parties in contractual relationships, may be liable for benefits solicited and received, for which compensation was promised and expected. As explained in *Metcalf Construction Company, Inc. v. United States*, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." 742 F.3d 984, 990 (Fed. Cir. 2014) (citing Restatement (Second) of Contracts § 205 (1981)). This principle applies to contracts with the federal government. *E.g.*, *Mobil Oil Exploration & Producing S.E., Inc. v. United States*, 530 U.S. 604, 607 ("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.") (quoting *United States v. Winstar Corp.*, 518 U.S. 839, 895 (plurality opinion) (internal quotation marks omitted)); *Precision Prime & Timber, Inc. v. United States,* 596 F.3d 817, 828 (Fed. Cir. 2010); *Malone v. United States*, 849 F.2d 1441, 1445–46 (Fed. Cir. 1988).

The panel majority holds that the government cannot be held liable for paying for the work done by G4S, reasoning that it is a "sovereign responsibili[ty] to safeguard taxpayer funds." Maj. Op. at 13. The sovereign has many responsibilities, including that of paying for work that it requests and receives. *See Metcalf Constr. Co.*, 742 F.3d at 994 ("[A] breach of the *implied* duty of good faith and fair dealing does not require a violation of an *express* provision in the contract.") (emphases in original); Eric A. Frechtel, "*The Government Must Administer its Contracts Fairly and Reasonably*," 54 CONTRACT MGMT. 30 (2014).

In sum, in view of the undisputed premise that authorized work was done by G4S in reliance on the government's assurances, this case warrants exploration of the equities as well as the law. The Court of Federal Claims did not reach this aspect. I would remand for this purpose.