ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| GSI & Whitesell-Green, JV | )   ASBCA No. 61816 |
| | ) |
| Under Contract No. FA3022-15-C-0001 | ) |

APPEARANCE FOR THE APPELLANT:     Mr. Josh Owens
                                  President

APPEARANCES FOR THE GOVERNMENT:   Jeffrey P. Hildebrant, Esq.
                                   Air Force Deputy Chief Trial Attorney
                                  Lt Col Byron G. Shibata, USAF
                                   Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE O'CONNELL

This appeal involves a claim for providing natural gas service to a building adjacent to the project at issue. Appellant seeks about $9,800 and has elected our Accelerated Procedure under Rule 12.3. Decisions under this rule contain summary findings of fact and conclusions. The parties also elected to submit the appeal on the record without a hearing under Rule 11 and requested that the Board decide entitlement only. We sustain the appeal.

SUMMARY FINDINGS OF FACT

The Air Force awarded appellant, GSI & Whitesell-Green, JV (GSI-WG), a contract in the amount of $6,657,731 to renovate Hangar 456 at Columbus Air Force Base. The contract required GSI-WG to demolish the building down to the frame and foundation and to design and rebuild it with a new foam fire suppression system. (R4, tab 7 at 39) The contract incorporated standard clauses, including the Federal Acquisition Regulation (FAR) 52.236-2, DIFFERING SITE CONDITIONS (APR 1984); and FAR 52.243-4, CHANGES (JUN 2007) (R4, tab 7 at 21).

Prior to bid, the Air Force conducted a site visit attended by representatives of 28 companies, including appellant (R4, tab 3 at 10). The visit lasted about two hours and occurred while the hangar was in use by the Air Force (R4, tab 2 at 2-3; gov't br., decl. of Robert Gable ¶ 2). Although the visitors thereafter submitted 146 written questions to the Air Force, none concerned the pipe we discuss below (R4, tab 5 at 112-28).

While the bid documents identified the locations of existing utilities, the Air Force disclaimed their accuracy. Thus, the contract provided:

D. Utilities

    1) <u>Layout</u>: Accuracy of government provided documents showing utilities is not guaranteed, but may help Contractor locate existing utilities. Verify all existing utility locations before starting work.

(R4, tab 7 at 47, *see also* tab 7 at 46, 96)

       Hangar 456 is close to another hangar, No. 450. A corridor referred to as Building 450A functions as a corridor between the two hangars. (Gov't br., decl. of Benjamin Sala at 3). At the corner where Hangar 456 meets Building 450A, a small mechanical room juts out from the side of Hangar 456 (R4, tab 7 at 126).

       As demonstrated in a photo taken by appellant during the site visit, the attendees would have seen a gas meter on the side of the mechanical room. Visible, but less obvious, was a short section of pipe (the "Pipe") that exited the wall at the corner of the mechanical room near the border with Building 450A and then entered 450A. (App. supp. R4, tab 6, photo A)



| H456 Mech. room | Gas Meter | The Pipe | H456 & B450 Border Line | B450A |

Neither party has provided the precise dimensions of the Pipe, but based on this photo we find that it was no more than one foot long and one to two inches wide.

As GSI-WG would learn after it began demolition, the Pipe was a gas line that could be traced back to the gas meter. The gas line entered the Hangar 456 mechanical room from the meter. Once inside the wall (and thus not visible), the line split at a tee connection where one line fed Hangar 456 and the other line exited the mechanical room and then entered Building 450A, as shown in the photograph. (App. br. at 7; gov't br. at 6) The bid documents/contract did not show a gas line or other utility in this location (R4, tab 7 at 137-41).

GSI-WG explains its failure to notice the gas line due to (among other reasons), the size of the Pipe in comparison to the relative size of an aircraft hangar and the fact that the pipe had been painted the same drab color as the rest of the two buildings and was a different color from the gas meter.*

There is no indication that the Air Force knew that the Pipe was a gas line. The only way for a bidder to have ascertained whether it was a gas line would have been to cut a piece out of the wall, which would have been impracticable on a short site visit and almost certainly would have been barred by the Air Force.

GSI-WG agrees that the contract required it to demolish the line and cap it, but it objected when the contracting officer also required it to provide temporary gas service to Building 450A and then relocate the gas meter to provide permanent service to that building (R4, tabs 16, 19, 21, tab 27 at 1; app. supp. R4, tab 4).

GSI-WG submitted a claim under the Contract Disputes Act contending that providing this gas service was outside the scope of the contract, thereby implicating the Changes clause (R4, tab 21); the contracting officer denied it in decisions issued on April 5, 2018 and July 3, 2018 (R4, tabs 25, 29). GSI-WG filed a timely appeal with the Board.

## DECISION

We first consider whether the Air Force can escape liability by disclaiming accuracy of utility locations and requiring the contractor to verify them. Far too many decisions have been written on this issue to discuss in a Rule 12.3 decision, but, in

---

* GSI-WG also contends that industry standards require gas lines to be painted yellow (app. br. at 9). While the Air Force does not challenge this statement, we are reluctant to make such a broad finding because GSI-WG fails to cite any authority. *But see Stars Investment Group, LLC v. AT&T Corp.*, 2017 WL 747610, at *3 (E.D. Mo. 2017) (noting without citation that a gas line "was marked with yellow paint according to industry standards"). We also acknowledge that the contract required GSI-WG to mark underground gas lines with yellow tape (R4, tab 7 at 47).

general, a government contract may assign a specific risk to a contractor, even if it is unwise for the contractor to accept the risk. *E.g., Lee's Ford Dock, Inc. v. Secretary of the Army*, 865 F.3d 1361, 1370-71 (Fed. Cir. 2017); *Rixon Electronics, Inc. v. United States*, 536 F.2d 1345, 1351 (Ct. Cl. 1976) (explaining that, if stated clearly, a contract may allocate to the contractor the risk "to make snowmen in August"). On the other hand, when contracts merely alert the contractor that information provided may be inaccurate and that it must be field verified, such clauses alone do not transfer the risk to the contractor. *Metcalf Construction Co. v. United States*, 742 F.3d 984, 988, 995-96 (Fed. Cir. 2014); *White v. Edsall Construction Co.*, 296 F.3d 1081, 1085 (Fed. Cir. 2002).

We hold that the clauses in this contract fall into the second category. While the Air Force clearly put GSI-WG on notice that the information provided pre-bid might not accurately identify all utilities, it did not go beyond that. The contract did not clearly convey that the Air Force intended the disclaimers to override the Differing Site Conditions and Changes clauses with respect to undisclosed utilities. *See Metcalf*, 742 F.3d at 996. Thus, an offeror would not have been aware that, if it found an unidentified utility line that necessitated work on the gas supply to a *different* building, then it would bear the financial consequences. Absent clear language that alerts the contractors that they would bear this risk (allowing them to factor it into their bids), we are unwilling to interpret the disclaimer clauses in the broad manner advocated by the Air Force.

A more significant obstacle to GSI-WG's recovery is that the both the gas meter and Pipe were visible on the site visit. Contractors are charged with knowledge of what a reasonable pre-bid site visit would have revealed. *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1346 (Fed. Cir. 1998). Thus, if a reasonably alert contractor would have noticed the Pipe and discerned it was an undisclosed utility, GSI-WG cannot recover. However, the duty to make an inspection of the site does not require the contractor to discover conditions "beyond the limits of an inspection appropriate to the time available." *Foster Constr. C.A. and Williams Bros. Co. v. United States*, 435 F.2d 873, 888 (Ct. Cl. 1970).

As evidence of what a reasonable contractor would have noticed at the site visit, GSI-WG observes that none of the site visit attendees asked any questions about the Pipe. In its view, if any of the other 27 attendees had suspected that the Pipe was a potential issue, they would have submitted a written question. Yet, none of the 146 questions they submitted asked some version of an important question: "what is that Pipe?" While GSI-WG's argument is speculative, the absence of a single question about the Pipe does suggest that none of the other visitors were concerned about it.

While we believe that the Air Force makes a fair objection that the Pipe was visible at the site visit, we conclude that ultimately this is outweighed by the failure to disclose the Pipe in the bid documents, as well as its small size, and the fact that it was painted the same color as the rest of the facility so that it blended, chameleon-like, into

4

the background. We find the following argument from GSI-WG's reply brief to be convincing:

> It is worth mentioning again that Hangar 456 is a 20,000SF (almost half an acre) facility, filled with miles of struts, supports, pipes, conduits, ducts, conductors and hoses; all crisscrossing in an industrial spider web throughout the structure. Bidders only had a couple of hours to walk around and inspect the entire facility, inside and out. While in the referenced photo the subject metal protrusion is somewhat front and center, it was a mere weed in the forest of improvements inspected during the site visit.

(App. reply br. at 9)

We conclude that this statement by GSI-WG places the Pipe, the above photo, and the dispute in their proper context. Simply finding the Pipe had a needle-in-the-haystack quality to it. While a good detective might have found it, he would also have had to deduce that, even though it was not yellow or the same color as the gas meter, the Pipe was a gas line (or some other utility) serving Building 450A. And he would have had to do so while the clock ticked on the site visit, 27 other contractors roamed around, and base personnel went about their daily duties. While such sleuthing might not have required Sherlock Holmes, GSI-WG has convinced us that it would have required perceptive powers beyond that of a reasonably prudent offeror. GSI-WG's provision of temporary and permanent gas service to Building 450A is extra work for which it is entitled to recover under the Changes clause.

## CONCLUSION

We sustain the appeal and remand to the contracting officer for determination of quantum.

Dated: March 20, 2019

MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

(Signature continued)

5

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61816, Appeal of GSI & Whitesell-Green, JV, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals