ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| JAAAT Technical Services, LLC | )  ASBCA No. 62373 |
| | ) |
| Under Contract No. W912HN-10-D-0063 | ) |

APPEARANCES FOR THE APPELLANT:     Mr. Rick B. Barnhill
                                                                            Administrator

                                                                        Andrew T. Bodoh, Esq.
                                                                            Thomas H. Roberts & Associates, P.C.
                                                                            Richmond, VA

APPEARANCES FOR THE GOVERNMENT:   Michael P. Goodman, Esq.
                                                                            Engineer Chief Trial Attorney
                                                                            Laura J. Arnett, Esq.
                                                                            Allie E. Vandivier, Esq.
                                                                               Engineer Trial Attorneys
                                                                               U.S. Army Engineer District, Savannah

OPINION BY ADMINISTRATIVE JUDGE SWEET

This appeal involves a task order on a multiple award task order contract (MATOC) between the government and JAAAT Technical Services, LLC (JAAAT) for the design and construction of a sensitive compartmented information facility addition at Fort Gordon, Georgia. JAAAT argues that the government: (1) constructively changed the contract when it required JAAAT to acquire a second National Pollution Discharge Elimination System permit (Permit) after the permitting authority revoked the first Permit; (2) breached its duty of good faith and fair dealing by failing to write a letter opposing the revocation of the first Permit; (3) constructively accelerated the completion date by insisting upon the completion of a task order within a period shorter than the period that would be allowable due to the purportedly excusable Permit and stair tower delays; and (4) failed to reimburse JAAAT for its costs to prepare a purported request for equitable adjustment (REA).[1] After a hearing, we conclude that those arguments are meritless for the reasons discussed below. Therefore, we deny the appeal.

---

[1] JAAAT voluntarily withdrew its claims regarding interior design and furniture, fixtures, and equipment (FF&E) (app. br. at 1). Thus, we do not address those issues.

I.    The Contract and Task Order

1.    On September 30, 2010, the Corps awarded Contract W912HN-10-D-0063 (0063 Contract)—a MATOC for design/build or construction type tasks in the South Atlantic Division Area—to JAAAT (R4, tab 3.01 at 1,180-82).

2.    The 0063 Contract included Federal Acquisition Regulation (FAR) Clause 52.236- 7, PERMITS AND RESPONSIBILITIES (NOV 1991), which stated that "[t]he Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work" (R4, tab 3.01 at 1,298).

3.    The 0063 Contract also included FAR 52.243-4, CHANGES (JUN 2007), which entitled JAAAT to an equitable adjustment for any changes to the 0063 Contract (R4, tab 3.01 at 1,304).

4.    On June 18, 2012, the Corps awarded Task Order 0002 (TO 0002) under the 0063 Contract to JAAAT for the design and construction of a sensitive compartmented information facility addition at Fort Gordon, Georgia (Project) (R4, tab 3.04).

5.    JAAAT subcontracted work on TO 0002 to Tetra Tech, and its subsidiaries Tetra Tech Tesoro and Tetra Tech EAS (stip. ¶ 16).  In particular, JAAAT subcontracted with Tetra Tech Tesoro to manage the project (R4, tab 10.04), and Tetra Tech EAS to serve as the designer of record (DOR) (tr. 2/113).

6.    On July 18, 2012, the government issued a notice to proceed on TO 0002. Given the 540-day performance period, that meant that the original contract completion date (CCD) was January 9, 2014 (R4, tabs 3.04 at 1,771; 3.05 at 1,778; stip. ¶¶ 5-7).  Through various modifications, the parties extended the CCD to September 17, 2014 (R4, tabs 5.11-5.13; stip. ¶ 8).  JAAAT substantially completed the Project on October 30, 2014, which was 43 days after the revised CCD (stip. ¶¶ 8, 11-12).

II.    Permits

A.    Standards Governing Permits

7.    Under the Georgia Erosion and Sedimentation Act of 1975 (Act), an operator— i.e., a contractor (R4, tab 8.10 (Ga. Code § 12-7-3(10.1)))—had to secure a Permit from the Local Issuing Authority (LIA) before conducting land-disturbing activities

2

(*id*. at § 12-7-7).  In this case, the LIA was the City of Augusta through the August/Richmond County Engineering Department (stip.¶ 20).

8.   In order to obtain a Permit, the Georgia Soil Water Conservation Commission (GSWCC) had to approve an Erosion, Sedimentation, and Pollution Control (E&S or ES&PC) plan (stip. ¶ 22).

9.   The Act required that all Permit applications be submitted in accordance with the statute, rules, regulations, ordinances, and resolutions adopted pursuant to the Act (R4, tab 8.10 (Ga. Code § 12-7-9(a))).  In particular, the Act required that all E&S plan designers possess Level II training and certification (R4, tab 8.10 at 9,445-46 (Ga. Code § 12-7-19(a)(1), (b)(3))).

10.  The LIA provided a checklist, which included the requirements that an E&S plan had to meet in order for the LIA to approve it (R4, tab 4.37 at 4,984-85, tab 8.04 at 4,761-62; tr. 2/117-18, 3/37).[2]  One item on the checklist was "Level II certification number issued by the Commission, signature and seal of the certified Design Professional (Signature, seal and Level II number must be on each sheet pertaining to ES&PC plan or the Plan will not be reviewed)" (R4, tab 2.01 at 396) (emphasis in original).

11.  Under the Act, if an LIA granted a Permit, "[t]he permit may be suspended, revoked, or modified by the local issuing authority . . . upon a finding that the holder . . . is in violation of this chapter or any ordinance, resolution, rule, or regulation adopted or promulgated pursuant to this chapter" (R4, tab 8.10 at § 12-7-11(b)).

12.  The person submitting the E&S plan or the permit holder could seek review of any permit revocation before the Augusta Commission (City of Augusta Soil Erosion, Sedimentation, and Pollution Control Ordinance (Ordinance) § IX(A)).[3]  After the exhaustion of administrative remedies, any person aggrieved by a decision of the LIA could obtain *de novo* review in state court (Ordinance § IX(B)).

---

[2] JAAAT now argues that the checklist did not provide the requirements that a Permit application had to meet to be approved (app. reply at 2).  However, in the contemporaneous correspondence, JAAAT repeatedly conceded that "[t]he ES&PC Plan includes a checklist that is required in the submission package. The checklist is a step-by-step list of 55 critical items that are required in the ES&PC Plan."  (R4, tab 4.37 at 4,983, tab 8.04 at 4,761-62)

[3] The Ordinance is available at https://www.augustaga.gov/DocumentCenter/View/4277 /Soil-Erosion-- Sediment-Control-Ordinance---July-2011?bidId=#:~:text=No% 20person%20shall%20conduct%20any,submitted%20to%20EPD%2C%20if%2 0applicable.

13. Augusta County was stricter in its application of the Act than other LIAs (tr. 1/182).

B.      Obtaining the Permits

14. Tetra Tech EAS prepared the first Permit application (stip. ¶ 16). James Warner of Tetra Tech EAS signed the E&S plan. However, Mr. Warner did not have a Level II certification. Thus, in the space provided for the "Level II Certification Number," Mr. Warner wrote the number 39250—which was his Professional Engineer license number and not a Level II Certification Number. (R4 tabs 2.01 at 371, 15.03-15.04; stip. ¶ 30)

15. On October 26, 2012, Tetra Tech EAS delivered the first Permit application via JAAAT to the Fort Gordon Directorate of Public Works (DPW) for courtesy review. The DPW then sent the first Permit application to the LIA on November 29, 2012 (tr. 1/41-42, 182; 2/240-41; stip. ¶¶ 23-24). While the DPW preferred to have communications between contractors and the LIA go through the DPW, contractors could—and did—communicate directly with the LIA. As Mr. Foley testified, the government "didn't like the contractors going down to the county and trying to do [the Permit application] themselves, if it was on our property. That's not to say that that didn't ever happen." (R4, tab 13.02 at 5,994 (Foley dep. at 14) (emphasis added))

16. The GSWCC approved the E&S plan on December 10, 2012 (tr. 1/170-71), and the LIA issued a Permit on January 8, 2013 (First Permit) (R4, tab 4.36 at 2,048). The DPW received the First Permit on January 10, 2013 (stip. ¶ 25).

17. On January 23, 2013, the LIA sent a letter to the DPW, which revoked the First Permit by stating that "the attached [ES&PC] Plan has been disapproved by the Georgia Soil Water Conservation Commission which is overseeing the Augusta Engineering Department ES&PC Plan Review" (R4, tab 4.36 at 2,052). Attached to the letter was the E&S plan checklist, with "39250 NO Certification # NO REVIEW" hand-written next to the "Level II certification number issued by the Commission, signature and seal of the certified Design Professional" item (id. at 2054).[4]

18. On January 24, 2013, an LIA representative emailed the DPW, stating that the "E&S review was approved in error by me. I did approve the engineering plan but

---

[4] On March 15, 2013, JAAAT and the government executed bilateral Modification No. R00002, which, *inter alia*, extended the CCD by 28 days for the "time required for obtaining the Primary Permittee signature as well as delay associated with the premature approval of the permit and subsequent disapproval requiring resubmission" (R4, tab 5.01 at 2,059; stip. ¶ 34).

4

also signed the Soil Conversion Sheet in error. The E&S plan is not approved and Bob Austin is returning the review comments and redlined plan to your engineer for correction and re-submittal." (Stip. ¶ 26)

19. The DPW then emailed JAAAT on January 25, 2013, stating that:

> The Local Issuing Authority (LIA) "Richmond County"
> issued the permit [in] error. The [ES&PC] plans are not
> approved at this time. The LIA is requiring that the permit
> be returned, and the project put on hold until the plans can
> be updated and resubmitted. Please return the Land
> Disturbing Activity Permit to me and I will go retrieve the
> plans and comments from the LIA.

(Stip. ¶ 27)

20. On January 25, 2013, the DPW retrieved the physical Permit from JAAAT, and returned it to the LIA; and retrieved the redline comments from the LIA, and provided them to Tetra Tech EAS (stip. ¶¶ 28-29).

21. The government did not question the LIA's authority to revoke the Permit because, since the E&S plan did not comply with the law, the government believed that there was no basis for challenging the revocation (tr. 1/51, 1/185, 1/198; R4, tab 13.02 at 6,064 (Foley dep. at 84)).

22. Nor did JAAAT challenge the Permit revocation directly to the LIA (tr. 2/173, 3/40, 3/59-60). The preponderance of the evidence does not establish that the government failed to tell JAAAT that it could challenge the Permit revocation directly (*compare* tr. 2/221-22, 4/12 *with* tr. 1/161).

23. JAAAT also did not ask the government to challenge the Permit revocation (tr. 2/219, 3/40). On the contrary, JAAAT participated in the determination that there was no basis for the government to challenge the Permit revocation (tr. 1/51).

24. Tetra Tech EAS prepared a second Permit application (stip. ¶ 16), which the DPW submitted to the LIA on February 1, 2013 (stip. ¶ 31). Mr. Warner again signed the ES&PC plan, and included his Professional Engineering license number instead of a Level II Certification Number (R4, tab 2.01 at 399).

25. On March 8, 2013, the LIA rejected the second Permit application, indicating that "Level II Certification Number of design professional who created the ES&PC Plan must be on each sheet pertaining to ES&PC Plan or plan will not be reviewed.

5

This is [the] second submittal of [a] plan without a Level II Certification Number of the design professional." (R4, tab 2.01 at 421-22)

26. Tetra Tech EAS prepared a third Permit application (stip. ¶ 16). This time, Brian Watson of Tetra Tech ESA signed the E&S plan, with a valid Level II Certification Number (R4, tab 2.01 at 426-442). The DPW submitted the third Permit application to the LIA on March 20, 2013 (stip. ¶ 36).

27. On April 3, 2013, the LIA rejected the third Permit application, indicating that "[t]he following items on the Plan Review Checklist for Stand Alone Construction Projects were missing from the ES&PC Plan, or were inadequate: 5, 11, 13, 14, 15, 18, 19, 20, 24, 29, 32, 38, 39, 40, 42, 43, 44, 45, 46, 48 & 52" (R4, tab 4.36 at 2,040-41).

28. Tetra Tech EAS prepared a fourth Permit application (stip. ¶ 16), which the DPW submitted to the LIA on April 16, 2013 (*id*. at ¶ 50).

29. On May 16, 2013, the LIA rejected the fourth Permit application because of problems with many of the same checklist items as had led to the rejection of the third Permit application—namely items 1, 3, 4, 5, 11, 14, 15, 20, 22, 24, 29, 31, 44, 45, 46, 52 (stip. ¶ 51; supp. R4, tab 4.37 at 4,986-87).

30. Tetra Tech EAS prepared a fifth Permit application (stip. ¶ 16), which the DPW submitted to the LIA on May 22, 2013 (*id*. at ¶ 52).

31. On May 28, 2013, the LIA conditionally approved the fifth Permit application, subject to the addition of a few notes (stip. ¶ 53; R4, tab 4.37 at 5,001).

32. Tetra Tech EAS prepared a sixth Permit application (stip. ¶ 16), which the DPW submitted to the LIA on May 30, 2013 (stip. ¶ 54).

33. The LIA approved the sixth Permit application, and issued a second Permit (Second Permit) on June 5, 2013 (stip. ¶ 55).

### C.    Correspondence Regarding the Permit

34. In a series of correspondence, JAAAT and Tetra Tech Tesoro blamed Tetra Tech EAS for the Permit delays. First, on March 6, 2013, JAAAT sent a letter to Tetra Tech EAS stating that "[w]e already have mud on our face due to the NPDES Permit drawing fiasco, let's not get any dirtier by delaying this response" (R4, tab 4.37 at 4,914).

35. Second, on March 29, 2013, Tetra Tech Tesoro sent a letter to JAAAT indicating its intent to request a change order for the costs associated with the Permit

6

delays. Tetra Tech Tesoro stated that "[i]t is our position that the [E&S Plan] was not properly prepared for submission to the LIA and that [Tetra Tech] EAS is responsible for any cost associated with this delay." (R4, tab 8.04 at 4,759)

36. Third, on April 9, 2013 and April 15, 2013, JAAAT sent two letters to Tetra Tech EAS indicating JAAAT's intent to back charge Tetra Tech EAS for the costs associated with obtaining the Permit. JAAAT stated that:

> Item #2, the Level II certification number and the signature and seal of the certified Design Professional are clear requirements for the permit application. Item #2 states in bold print that the plan will not be reviewed if the Level II certification information is not provided on each sheet of the Plan.
>
> The revocation of the permit has caused a delay in the critical path of the project because we are not able to begin site work without the permit. It is our position that the Plan was not properly prepared for submission to the LIA and that [Tetra Tech] EAS [is] responsible for any costs associated with this delay.

(R4, tabs 4.37 at 4,983-84, 8.04 at 4,761-62)

37. Fourth, on April 23, 2013, Tetra Tech Tesoro sent a letter to the government indicating that JAAAT had a "[c]ontractor caused delay to our Erosion Sediment Pollution Control Plan (ESPCP) permit" (R4, tab 4.14 at 1,812).

38. Fifth, on October 10, 2013, JAAAT sent a letter to Tetra Tech Tesoro complaining about Tetra Tech Tesoro's management of Tetra Tech EAS. In the letter, JAAAT stated:

> Most glaringly was the NPDES Permit process . . . . [A] review of the permit by the state authorities resulted in the permit being revoked within two weeks (January 23, 2013). The state review had found numerous errors, most notably, the failure to correctly sign and stamp the drawings. In fact, the DOR did not possess the proper certification to submit the plan. This had to be contracted to a sister office of the DOR. We went through a variety of resubmittals and rejections, as we built delay.

(R4, tab 11.02 at 5,706)

7

## III.  Stair Tower

39.  During the 100 percent design review in May 2013, the parties discovered that the width of the stairway in the specification did not comply with the fire code.  The widened stairway created a bump in the building, known as the stair tower.  (Tr. 1/95; 3/21-22)

40.  On February 18, 2014, JAAAT submitted an REA seeking 52 days for the stair tower delays (R4, tab 4.32 at 1,945-46).  That REA did not include a fragnet[5] (R4, tab 4.32).  JAAAT adequately supported its stair tower REA with a fragnet on April 10, 2014 (R4, tab 4.34; tr. 2/38-39).

41.  On August 19, 2014, the parties executed bilateral Modification No. R00012, extending the CCD by 52 days to July 13, 2014, due to the stair tower delays.  Modification No. R00012 did not change the price, and indicated that negotiations regarding the price were on-going.  (R4, tab 5.10)

## IV.  Procedural History

42.   In the Corps of Engineers Savannah District, an administrative contracting officer (ACO) in the Fort Gordon field office handled REAs (tr. 4/22).  Accordingly, prior to January 5, 2017, JAAAT submitted REAs to the Fort Gordon field office— and not to contracting officer (CO) Jennifer Murphy in the Savannah District main office (R4, tabs 4.05, 4.06, 4.14, 4.15, 4.32, 4.34).

43.  On January 5, 2017, JAAAT submitted a letter to CO Murphy.  The January 5, 2017 letter was entitled "Requests for Equitable Adjustment (REA)," and the first sentence stated that "[t]his submission provides further information respecting additional Requests for Equitable Adjustments."  (R4, tab 2.01 at 151)  The January 5, 2017 letter concluded by stating that "[t]his Request for Equitable Adjustment presents the additional adjustments due JAAAT for four(4) [sic] issues specified . . . . The total requested adjustment JAAAT is seeking is $3,215,346."  (*Id.* at 235)

---

[5] A fragnet is "a contemporaneous, fragmentary scheduling network, which graphically identifies the sequencing of all critical and non-critical new activities and/or activity revisions affected by a Compensable Delay or Excusable Delay with logic ties to all affected existing activities noted on the Design-Build Schedule, that isolates and quantifies a time impact of a specific issue, determines and demonstrates any such specific Delay in relation to past and/or other current Delays and provides a method for incorporating all Contract Adjustments to the Contract Time into an update of the approved Design-Build Schedule."  www.lawinsider.com/dictionary/fragnet.

The January 5, 2017 letter also included an executed "Certification as required Per FAR 52.233-1(d)(2)(iii)," which stated that:

> "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor."

(*Id.* at 150) (quotation marks in original)

44. On October 26, 2017, JAAAT sent a letter to CO Murphy entitled "status of Multiple Requests for Contracting Officer's Final Decision," which requested "resolution on multiple Request for Equitable Adjustment (REA) Contracting Officer Final Decisions (COFD) submittals" (app. supp. R4, tab S-2.9).

45. On October 11, 2019, the Corps issued a COFD denying the REA, which it considered to be a claim under the CDA (R4, tab 1.02).

46. JAAAT filed an appeal, which we docketed as ASBCA No. 62373.

V.     Litigation Between JAAAT and Tetra Tech

   A.     The Georgia Litigation

47. On February 10, 2017, Tetra Tech filed an action against JAAAT in a Georgia state court for breach of contract and unjust enrichment regarding the Project (Georgia Litigation) (R4, tab 8.04 at 4,702).[6]

48. On April 7, 2017, JAAAT filed its answer, affirmative defenses, and counterclaim in the Georgia Litigation, which alleged that Tetra Tech "[f]aile[d] to timely obtain and support the issuance of the NPDES Permit" resulting in significant delays on the Project (R4, tab 8.04 at 4,750-51).

---

[6] JAAAT subsequently removed the action to the United States District Court for the Southern District of Georgia (R4, tab 8.04 at 4,702).

B.    The Virginia Litigation

49.  On April 17, 2015, JAAAT sued Tetra Tech Tesoro, Inc. in the United States District Court for the Eastern District of Virginia (Virginia Litigation), alleging that Tetra Tech Tesoro was in default of the subcontract (R4, tab 11.01 at 5,452).

50.  In the Virginia Litigation, Eddie Cummings—JAAAT's Director of Projects—filed an expert report (R4, tab 11.05 at 5,740-41).  In that report, Mr. Cummings stated that:

> Tetra Tech personnel . . . were inexperienced in the necessary, required submittals to manage a Government project and that their unfamiliarity with the Project Specifications caused significant unrecoverable delay.  The analysis of the Whitelaw Wedge (Ft. Gordon) project will focus on the failure of Tetra Tech to properly prepare the necessary required submittals required to start work . . . .

(*Id*. at 5,745)

51.  In a supplemental expert disclosure, Mr. Cummings attributed all of the Project's delays solely to Tetra Tech Tesoro (R4, tab 11.06 at 5,770).

52.  During his deposition in the Virginia Litigation, Mr. Cummings admitted that "I sent some REA[s] to the government that Tetra Tech had a hard time selling me on were real, but in the nature of partnering, sent them anyway and said if [the government] buy[s] them, great" (R4, tab 11.08 at 5,879).  In particular, when asked about the Permit delay, Mr. Cummings testified that he disagreed with Tetra Tech's reasoning because "they were in control of the designer who was in control of getting the permit" (*id*. at 5,880).  Mr. Cummings also testified that he disagreed with Tetra Tech's acceleration claim because "there was no acceleration" (*id*.).

DECISION

JAAAT argues that the government (1) constructively changed the 0063 Contract when it required JAAAT to acquire a Second Permit (app. br. at 46-48); (2) breached its duty of good faith and fair dealing by failing to write a letter opposing the revocation of the First Permit (*id*. at 43-46); (3) constructively accelerated the CCD date by insisting upon the completion of TO 0002 within a period shorter than the period that would be allowable due to the purportedly excusable Permit and stair tower delays (*id*. at 64-71); and (4) failed to reimburse JAAAT for its costs to prepare the January 5, 2017 letter (*id*. at 72-73).  As discussed below, all four arguments are meritless.

10

I.  The Government did not Constructively Change the 0063 Contract

JAAAT has not shown that the government constructively changed the 0063 Contract.  In order to establish that there was a constructive change, a contractor must show that: (1) an official compelled it to perform work not required under the terms of the contract; (2) the official directing the change had contractual authority to alter the contractor's duties unilaterally; (3) the official enlarged the contractor's performance requirements; and (4) the added work was not volunteered, but resulted from the official's direction.  *Alfair Dev. Co.*, ASBCA Nos. 53119, 53120, 05-2 BCA ¶ 32,990 at 163,515.  In determining what work a contract requires, "clear and unambiguous [contract provisions] must be given their plain and ordinary meaning.  *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (*en banc*) (citation omitted).  "To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract.  Rather, both interpretations must fall within a 'zone of reasonableness.'"  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).  In particular, a contract that requires a contractor to obtain all necessary permits to comply with the law without additional expense to the government unambiguously imposes a duty upon the contractor—and not the government—regarding permits.  *Bell/Heery v. United States*, 739 F.3d 1324, 1331-33 (Fed. Cir. 2014); *see also AMEC Env't & Infrastructure, Inc.*, ASBCA No. 58948, 15- 1 BCA ¶ 35,924 at 175,593-94.

Here, JAAAT's interpretation of the 0063 Contract as not requiring it to acquire the Second Permit does not fall within the zone of reasonableness (app. br. at 45-47; app. reply at 17-18).  The plain language of the 0063 Contract required JAAAT to, "without additional expense to the Government . . . [,] obtain[] any necessary licenses and permits and . . . comply[] with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work" (finding 2).  When the LIA revoked the First Permit, the LIA took, withdrew, annulled, canceled, or reversed the First Permit.  WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY, 1648 (1996).  Thus, once the LIA revoked the First Permit (finding 17), JAAAT no longer had a Permit, and it thus became necessary to obtain a Second Permit to comply with the laws, codes, and regulations applicable to the performance of the work because the Act stated that a Permit was necessary authorization to conduct land-disturbing activity (finding 7).  As a result, the 0063 Contract unambiguously required JAAAT to acquire a necessary Second Permit once the LIA revoked the First Permit.

To avoid that conclusion, JAAAT argues that the First Permit was valid and improperly revoked by the LIA (app. br. at 44-48).  Those arguments are meritless.  Under the Act, an LIA could revoke a Permit if it found a violation of law (finding 11).  Here, the LIA provided JAAAT and the government its findings that it was revoking the First Permit because the design professional did not have a Level II certification (finding 17).  That finding was correct.  The First Permit was not valid

because the Act required the design professional to have a Level II certification, and Tetra Tech EAS's design professional did not have a Level II certification (findings 9-10, 14).

Moreover, even if the First Permit was valid and the revocation was improper, those facts at best would impact the means available for obtaining a Permit after the revocation by creating the possibility of obtaining the reinstatement of the First Permit through a Permit revocation challenge (finding 12). However, it would remain JAAAT's duty to pursue those means because it would remain JAAAT's duty to obtain all necessary Permits to comply with the law after the Permit revocation (finding 2), and—once the LIA revoked the First Permit—it was necessary to obtain a Permit before JAAAT legally could engage in land disturbing activities (finding 7). JAAAT did not pursue those other means of challenging the Permit revocation because it never even asked the LIA for the First Permit back (finding 22).

JAAAT argues that it did not have to challenge the Permit revocation because the government never told JAAAT that it could challenge the Permit revocation (app. br. at 46). However, the preponderance of the evidence does not establish that the government failed to tell JAAAT that it could challenge the Permit revocation (finding 22). In any event, because the 0063 Contract required JAAAT to obtain all necessary permits to comply with the law without additional expense to the government, (finding 2), it did not impose any duty upon the government regarding the Permit—such as a duty to tell JAAAT that it could challenge the Permit revocation. *See Bell/Heery*, 739 F.3d at 1332-33.

JAAAT also argues that it did not have to challenge the Permit revocation because the government generally prevented contractors from communicating with the LIA (app. br. at 45-46). While the DPW preferred that communications with the LIA go through the DPW, contractors could—and did—communicate directly with the LIA (finding 15). In any event, even if communications had to go through DPW, JAAAT's duty to acquire necessary permits without additional expense to the government at a minimum required JAAAT to ask the DPW to object to the Permit revocation, which it failed to do (findings 2, 23). On the contrary, JAAAT participated in the determination that there was no basis for challenging the LIA (finding 23). Because it was JAAAT's duty under the 0063 Contract to obtain all necessary permits, the government did not constructively change the 0063 Contract when it required JAAAT to obtain the necessary Second Permit—or reinstated First Permit—once the LIA revoked the First Permit.

## II. The Government did not Breach its Duty of Good Faith and Fair Dealing

Nor has JAAAT shown that the government breached its duty of good faith and fair dealing. Every contract imposes upon each party a duty of good faith and

fair dealing in its performance and enforcement.  *CBRE Heery, Inc.*, ASBCA No. 62420, 21-1 BCA ¶ 37,927 at 184,201 (citing *Future Forest, LLC v. Sec'y of Agric.*, 849 Fed. App'x 922, 926 (Fed. Cir. 2021)).  The duty of good faith and fair dealing applies equally to contractors.  *J.C. Mfg., Inc.*, ASBCA No. 34399, 87-3 BCA ¶ 20,137 at 101,935.  The duty includes a duty not to interfere with the other party's performance, and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.  *CBRE Heery*, 21-1 BCA ¶ 37,927 at 184,201 (citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014)).  A party cannot use the duty of good faith and fair dealing to expand another party's contractual duties beyond those in the express contract, or to create duties inconsistent with the contract's provisions.  *CBRE Heery*, 21-1 BCA ¶ 37,927 at 184,201 (*citing Future Forest*, 849 Fed. App'x at 926).  On the contrary:

> "the nature of that bargain is central to keeping the duty focused on 'honoring the reasonable expectations created by the autonomous expressions of the contracting parties.'" *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) (quoting *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1152 (D.C. Cir. 1984)).  Put differently, the implied duty of good faith and fair dealing is "limited by the original bargain: it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value." *Metcalf*, 742 F.3d at 991.  Accordingly, a party's conduct will not be found to violate the duty "if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision." *Id*.

*Future Forest*, 849 Fed. App'x at 926.

Here, JAAAT argues that the government breached its duty of good faith and fair dealing by failing to write a letter challenging the Permit revocation (app. br. at 45; app. reply at 17-19).[7]  However, imposing a duty upon the government to take steps to get the LIA to reinstate the First Permit improperly would create a duty inconsistent with the 0063 Contract provisions discussed above requiring JAAAT to

---

[7] JAAAT repeatedly complains about the government returning the physical Permit (app. br. at 45-46; app. reply at 18-19).  However, that was reasonable because, as discussed above, the LIA properly revoked the Permit as being invalid and JAAAT never even asked for the government to challenge the Permit revocation (findings 9-10, 14, 17-18, 23).

acquire necessary Permits without additional expense to the government (finding 2); *Bell/Heery*, 739 F.3d at 1332-33.  Thus, we must reject JAAAT's breach of a duty of good faith and fair dealing claim.  *See Future Forest*, 849 Fed. App'x at 926; *CBRE Heery*, 21-1 BCA ¶ 37,927.

Moreover, the argument that the government breached its duty to JAAAT because it did not, *sua sponte*, write a letter to the LIA that JAAAT, itself, did not request verges on being risible.  The government reasonably could have expected that JAAAT would request that the government write a letter challenging the Permit revocation if JAAAT believed that such a letter would expedite the Project.  That is particularly true because it is unclear whether challenging the Permit revocation would have expedited the Project.  On the contrary, because the LIA was strict about issuing Permits (finding 13), the more likely outcome of challenging to the Permit revocation would have been that JAAAT and/or the government would have had to pursue administrative remedies, followed by judicial review (finding 12).  JAAAT has not shown that that would have been quicker than applying for a new Permit.  Moreover, given that the design professional did not have a Level II certification (finding 14), it is unlikely that the county or the Court would have reversed the LIA.  Given that uncertainty—and indeed unlikelihood of success—in challenging the Permit revocation, it was reasonable for the government to expect JAAAT to at least ask the government to challenge the Permit revocation if JAAAT believed that such a challenge would expedite the Project.  Not only did JAAAT fail to make such a request; it participated in the determination that there was no basis for the government to challenge the LIA (finding 23).  Having failed to even ask the government to challenge the Permit revocation—and indeed having participated in the decision not to do so—JAAAT cannot now come to the Board complaining about the government's failure to challenge the Permit revocation.[8]

III. There was no Constructive Acceleration

JAAAT has not shown that there was a constructive acceleration either.  In order to prove a constructive acceleration claim, the contractor must prove that:  (1) it encountered an excusable delay; (2) the contractor made a timely and sufficient request for an extension of the contract schedule; (3) the government denied the

---

[8] Indeed, the fact that JAAAT still does not assert—let alone attempt to prove—in its briefs that challenging the Permit revocation would have been quicker than applying for a new Permit (app. br. at 45) strongly suggests that JAAAT would not be able to prove causation.  Likewise, the delays caused by JAAAT's repeated failures to submit a valid Permit application also raise serious causation problems (findings 26-31).  However, we need not reach the causation issue because we conclude that there was no change or breach of the covenant of good faith and fair dealing.

contractor's request for an extension or failed to act on it within a reasonable time; (4) the government insisted upon completion of the contract within a period shorter than the period to which the contractor would be entitled by taking into account the period of excusable delay, after which the contractor notified the government that it regarded the alleged order to accelerate as a constructive change in the contract; and (5) the contractor was required to expend extra resources to compensate for the lost time and remain on schedule. *Fraser Constr. Co. v. United States*, 384 F.3d 1354, 1361 (Fed. Cir. 2004). Subcontractor delay will not excuse a contractor's delay unless the subcontractor delay itself is excusable. *E&R Inc.*, ASBCA Nos. 48056, 48057, 95-2 BCA ¶ 27,745.

Here, JAAAT points to two purported excusable delays—the delays in obtaining the Permit and the delays cause by the stair tower change (app. br. at 65-70; app. reply at 25). It has failed to show that either supports a constructive acceleration claim.

First, JAAAT has failed to show that the delays in obtaining the Permit are excusable because they were the fault of JAAAT's subcontractor. As discussed above, the Permit delays until March 20, 2013—when the third Permit application was submitted—were due to Tetra Tech EAS's failure to have a design professional who had a Level II certification (findings 9-10, 14-26).[9] Moreover, the Permit delays after March 20, 2013 were due to Tetra Tech EAS's repeated failures to submit an adequate Permit application, which led the LIA to repeatedly reject the applications (findings 26-33).

JAAAT does not even attempt to show that the post-March 20, 2013 rejections were invalid or incorrect (app. br. at 52-56; app. reply at 20-21). Instead, JAAAT argues that it was the government's burden to establish that the LIA's rejections were valid because, once JAAAT established that the government initiated the delay by failing to object to the Permit revocation, the issue of whether the subsequent

---

[9] JAAAT argues that the second rejection reasonably misled Tetra Tech EAS to believe that the issue was only the placement of the design professional's signature—and not his lack of a Level II Certification Number—because it stated that "Level II Certification Number, must be on each sheet pertaining to ES&PC Plan or plan will not be reviewed" (app. br. at 54). Tetra Tech EAS was not reasonably misled because the design professional necessarily had to have a Level II Certification Number in order to place that number on each sheet. To the extent there was any doubt, the second rejection went on to clearly indicate that the lack of a Level II Certification Number for the design professional was the problem by stating that "[t]his is [the] second submittal of [a] plan without a Level II Certification Number of the design professional." (Finding 25)

15

rejections were proper was an issue of mitigation (app. br. at 51-56; app. at reply 20). However, as discussed above, the government did not improperly initiate the delay by failing to object to the First Permit revocation. Thus, under *Fraser*, 384 F.3d at 1361, it remains JAAAT's burden to prove excusable delay. It has failed to do so here. Indeed, in the contemporaneous correspondence, JAAAT and Tetra Tech repeatedly acknowledged that the Permit delays were due to Tetra Tech EAS (findings 34-37). Likewise, during the Georgia and Virginia Litigation, JAAAT and its Director of Projects repeatedly acknowledged that the Permit delays were due to Tetra Tech EAS (findings 47-52). Therefore, JAAAT has failed to show that the Permit delays constituted excusable delay.

Second, while JAAAT has shown that the stair tower change was an excusable delay, JAAAT did not make a sufficient request for an extension of time due to that delay until April 10, 2014, when it submitted a fragnet in support of its request (finding 40). The government granted that request in bilateral Modification No. R00012 on August 19, 2014 (finding 41). JAAAT's conclusory assertion that the government failed to grant the extension within a reasonable amount of time is insufficient to meet its burden of proving that approximately four months to negotiate a bilateral modification was an unreasonable amount of time under the circumstances of this case (app. br. at 70; app. reply at 25). In any event, JAAAT has not pointed to any evidence that, between its request and bilateral Modification No. R00012, the government insisted upon completion of TO 0002 within a period shorter than the period to which JAAAT would be entitled by taking into account the period of excusable stair tower delay (app. br. at 34-35). Nor has JAAAT pointed to any notification it provided to the government after any purported order indicating that JAAAT regarded any purported order to accelerate as a constructive change (*id*. at 65-70).[10] Indeed, JAAAT's Director of Projects admitted during the Virginia Litigation that "[t]here was no acceleration" (finding 52). Therefore, JAAAT has failed to meet its burden of showing that there was a constructive acceleration.

IV. Preparation Costs

Finally, JAAAT has not shown that it is entitled to recover the costs of preparing its January 5, 2017 letter (app. br. at 72-73). Costs incurred in connection

---

[10] JAAAT argues that it need not show that it specifically notified the government that it regarded any purported order to accelerate as a constructive change (app. reply at 24 (*citing Norair Eng'g Corp. v. United States*, 666 F.2d 546, 548 n.5 (Ct. Cl. 1981))). The United States Court of Appeals for the Federal Circuit has more recently opted for a formulation that includes a notification requirement. *Fraser,* 384 F.3d at 1361. In any event, we need not resolve the dispute because, even absent its notification deficiencies, JAAAT's constructive acceleration claim fails for the other reasons discussed above.

16

with the prosecution of a claim are not recoverable. 48 C.F.R. § 31.205-47(f)(1). A claim is "a written demand . . . by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." 48 C.F.R. § 33.201. A written REA is a claim if it satisfies those regulatory elements. *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575-78 (Fed. Cir. 1995).

Here, the January 5, 2017 letter was a claim. First, it was written demand (finding 43). Moreover, the January 5, 2017 letter demanded payment as a matter of right because, it (1) "presents the additional adjustments due JAAAT for four . . . issues specified," and (2) contained a claim certification pursuant to FAR 52.233-1(d)(2)(iii), which requested an amount "for which the Contractor believes the Government is liable . . ." (*id.*). Third, the January 5, 2017 letter sought a sum certain by stating that the "total requested adjustment JAAAT is seeking is $3,215,346" (*id.*).

JAAAT does not even attempt to dispute that the January 5, 2017 letter was a written demand seeking, as a matter of right the payment of money in a sum certain (app. br. at 73). Instead, JAAAT argues that the fact that January 5, 2017 letter indicated that it was an REA evidences an intent that the document be an REA instead of a claim (*id.*). That is a false dichotomy. An REA also can be a claim, if it meets the regulatory elements—which is the case here. *Reflectone*, 60 F.3d at 1575-78.

JAAAT also argues that the January 5, 2017 letter cannot be a claim because it did not request a COFD (app. br. at 73). However, a claim need not use "magic words." *Transamerica Ins. Corp. v. United States*, 973 F.2d 1572, 1578 (Fed. Cir. 1992). By sending a request for an adjustment due, for which JAAAT asserted the government was liable, and attaching a claim certification pursuant to FAR 52.233-1(d)(2)(iii), JAAAT was at least implicitly requesting a COFD (finding 43); *Andrews Contracting Servs., LLC*, ASBCA No. 60808, 17-1 BCA ¶ 36,766 at 179,168 (recognizing that an implicit request for a COFD is sufficient). Indeed, the fact that JAAAT submitted the January 5, 2017 letter to CO Murphy in the Savannah District main office, instead of to the personnel in the Fort Gordon field office who handled REAs—as JAAAT had done with prior REAs—supports the conclusion that JAAAT was at least implicitly requesting a COFD (findings 42-43).

As a result, the REA was a claim, and JAAAT therefore is not entitled to the costs incurred in connection with the preparation of that document under FAR 31.205-47(f)(1).

## CONCLUSION

For the foregoing reasons, the appeal is denied.

Dated: March 8, 2022

JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62373, Appeal of JAAAT Technical Services, LLC, rendered in conformance with the Board's Charter.

Dated: March 9, 2022

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

18